v. Davis, Davis, Davis, Morris, Moore, Arnold, and King, and at the first side, Hagen, Smith, DeMers, and Hagen, Smith, Hagen, Smith, Hagen, Smith, Hagen, Smith, Hagen, Smith, Hagen, I'd like to reserve three minutes for rebuttal. Counsel, and may it please the court. Plaintiff's Article III standing, in this case, hangs on one event. It may not have been clear from the briefs, but I want to just establish that now. And that is the June 30th letter from my client's law firm defendants to the plaintiff's former attorney, James Sandy. In plaintiff's brief, they mention acts of green tree, mortgage servicer, they mention hypothetical injuries related to state law causes of action. But none of that is relevant. There's one federal claim in this case. It's the only one that has been remaining since 2013. The other alleged federal claims were not seriously litigated. They were dismissed on statute of limitations grounds based on the face of the pleadings themselves. Well, you know, the June 8th, the resolution of the federal claim with respect to the June 8th letter on statute of limitations grounds? Yes, sir. Doesn't that suggest there was jurisdiction? I mean, that's resolved on the merits, and that's res judicata. And if you get what you think is appropriate on the June 30th letter, and I'm glad you want to talk about it. It's really important. It seems odd to me. It almost seems a little unfair. Let's just say you're right on the June 30th. It would suggest to me that it should not be res judicata as to the June 8th, because if you're right, I think the same problem would infect the June 8th letter, and there was never jurisdiction to look at that. So do you understand what I'm saying? You're asking if because of the June 8th letter there would still be the possibility of supplemental jurisdiction? No, I'm just making the point. If you're right about the June 30th letter, that we have no, there's no injury in fact, therefore no standing, no Article III jurisdiction. Wouldn't you agree with me the same would be true as to the June 8th letter? Yes, Your Honor, I would. Okay, so here's what seems a little unfair about that. When we dismiss for lack of jurisdiction, it doesn't have res judicata effect, right? Right. But the June 8th ruling does have res judicata effect. Do you understand what I'm saying? Yes. But that was time barred. That's a ruling. It's on the merits, and it's over. So what do we do about that? That just doesn't seem right to me. Well, it's on the trial court to determine subject matter jurisdiction, Article III standing sua sponte, throughout the course of the case. So the fact that, I mean, they could have determined early on that there was no subject matter jurisdiction as early as 2013, and, I mean, are you asking is it unfair that that claim doesn't go forward? What you're saying is it's bad luck. Yes, it is. That's the answer. It is. I don't know. All right, well, you want to talk about the June 30th letter. Let's talk about it. With regard to standing? Yeah. The elephant in the room on the June 30th letter for standing is that it was never sent or addressed to the plaintiffs. The decision from the trial court recognized no damage from the June 30th letter to the plaintiffs, and spokio requires concreteness, a de facto injury that exists. First of all, none was recognized by the trial court to the plaintiffs based on the June 30th letter. The second issue, before we get to the fact that it was not sent to the plaintiffs, is I believe the holding from this court in Leisch v. Levy closes the door on a concrete injury for the June 30th letter as well. Plaintiffs attempt to distinguish Leisch by saying the facts from Church via creed of health are different because Leisch ruled on Church. The problem with that argument is that Church had only one holding. Church only dealt with a missing Minnie Miranda on a letter to a debtor. And this court in Leisch didn't distinguish the facts of Church. This court in Leisch dealt with the facts head on and said, yes, those are the facts from Church. The only facts from Church are a missing Minnie Miranda on a debtor letter. We're choosing to not follow Church. And again, there's no point in belaboring this, but the June 30th letter, we don't even know if the plaintiffs ever saw it. It would be unusual because if the court examines the letter, it was a cover letter. It followed a conversation that law firm defendants had with plaintiffs' former counsel. It was entirely truthful. It was a rather perfunctory sort of ministerial correspondence that said, in close, please find this, this, this. And this follows up on our conversation. Why can't Congress create injuries? Can't Congress say if you don't do something, it's an injury? According to Spokio, they cannot create an injury, in fact. They can create a procedural right that the court can recognize if violated may be an injury, but there still has to be a harm or a risk of harm. And we go back to the June 30th letter. The recipient of the letter thought nothing of it, and we don't know if the plaintiffs ever saw it. And again, there was nothing substantively wrong or misleading about the letter, just missing the mini Miranda. Even if there is standing, the FDCPA claim should fail because, again, the June 30th letter was not sent to the plaintiffs. There may be a circuit split about a blanket exemption from the FDCPA for communications between attorneys. There is a circuit split on that. But there is no circuit split on this issue, the issue of the mini Miranda from E11. In the sea of cases the plaintiffs have cited, not a single one has held that that mini Miranda is required in communications between attorneys. We would certainly point the court towards those circuits, such as the ninth, that say the FDCPA does not cover communications between attorneys. But even outside those circuits, there is none that have applied the FDCPA the way the plaintiffs propose here. Plaintiffs cited Bishop v. Ross Burrell from the 11th Circuit. It examined two cases, every from the 7th Circuit, indictment from its own circuit, the 11th. Bishop did not state there is a blanket exemption from the FDCPA to intra-attorney communications. However, it did say, even given that, requiring the mini Miranda from E11 to communications between attorneys would be a pointless formality. Why does it make a difference, this attorney thing? I mean, aren't attorneys obligated to give letters to the clients? I mean, we may not know what happened here. I get what you're saying there. But I guess I'm just not sure what it means that it goes to an attorney. It's not like the attorney takes it and takes out all the threatening language. Well, that's what the circuits have found when they haven't found a blanket exemption. If there's threatening language, they found, okay. If an attorney sends another attorney a letter with threatening language or something that's blatantly false, hey, your client owes four times what's actually owed. Some of the circuits where there is a split have said, okay, that might be actionable under the FDCPA. But there is, first of all, the statute itself says in communications with a consumer, not the consumer's attorney. Second of all, the FDCPA in subsection C distinguishes between a communication with an attorney and a communication with the consumer, their client. I mean, you could almost make the argument that sending a letter to an attorney is more threatening. I mean, you have two people that are married and suddenly the husband finds out that his attorney just got a letter from his wife. He's going to be pretty bummed out. So the act itself of the attorney receiving it. Yeah, this is serious stuff. I'm sending it to the attorney. It's serious enough that I sent it to a lawyer, officer of a court as opposed to you directly. I believe if it were a threatening letter, depending on the content of the letter, I think the court has to look at the letter as other circuits have done. If the court decides not to go with a blanket exemption from the FDCPA for intra-attorney communications, I think you then have to go to what the other circuits have done and look at the content of that letter and say, was it false? Was it misleading? Or did it simply omit a statement that the recipient of the letter himself found to be a non-issue? Something that's not addressed by the plaintiff is how this application would work because E-11 does not limit its application to written communications between attorneys. It says any subsequent communication. So we still have that hypothetical where two attorneys cross paths in the courthouse. They're there on different cases, but one says to the other, hey Jim, remember we have that deed in lieu we need to finalize on that Jones case. The attorney says, yeah, look for my email or letter. At that point, the creditor's attorney needs to go, and by the way, Jim, this is a communication from a debt collector. This is an attempt to collect debt. All information will be used for that purpose. That is what the application that plaintiffs propose would do. Similarly, the Ohio Consumer Sales Practices Act claims have three substantial hurdles. First of all, in order to survive, the law firm defendants must be suppliers to the plaintiffs as suppliers is used in that act. Attorneys are not suppliers under consumer protection statutes to adverse parties in litigation. Clark v. Lender Processing from this circuit is unequivocal. It dealt with an OCSPA claim against a company and its related attorneys who initiated and managed a foreclosure process. This court opined that consumers would only interact with lender processing because its lender client had hired the company to help initiate and manage a foreclosure. Managing a service that ends with a consumer losing her home could scarcely be considered a service for the consumer. The reasoning applies not just to lender processing, but the defendant law firms. The most important holding from Clark, I believe, is that the plain language of the OCSPA should be taken seriously. Companies that are not in the business of affecting or soliciting consumer transactions are not suppliers engaging in a consumer transaction. Law firm defendants had a client, Green Tree Services, servicing a mortgage. Green Tree Services had a client, the lender, a trust, I believe. That was the consumer relationship. Law firm defendants did not have a supplier-consumer relationship with a party they were suing in foreclosure. So remind me, your position on the Ohio law is it does not incorporate the federal requirements? Correct. Isn't there a lot of Ohio case law where that's exactly what the Ohio Supreme Court has done? They've taken these general liability rules, so Title VII is a great example. Along comes the state and acts a similar regime, not word for word, but similar. Doesn't the Ohio Supreme Court often say, we look to federal law to figure out how to apply these statutes? If you're looking at this court in Slork v. Lerner, Samson and Rothfuss said that finding an OCSPA or FDCPA violation requires examining whether the alleged conduct is expressly prohibited under each statute. I have no doubt that if there's federal law saying, for example, rolling back odometers or something like that, that is clearly deceptive, Ohio can look to federal law and say, well, that's deceptive. But it's also deceptive on its own merits. Something as specific, because this isn't an omission, this is a commission, you have to place this language on letter. Something like that, if the state of Ohio wanted to require a mini-Miranda, they could do that and they could give it a two-year statute of limitations. Because I would submit, if we're going to incorporate wholesale, the mini-Miranda provision of the Fair Debt Collection Practices Act, we would need to incorporate a statute of limitations as well. All right, thank you. Appreciate it. On the other side. Good morning, Your Honors. My name is Ed Eickhove and this is Kristen Finzel Lewis. She is from Southeast Ohio Legal Services. That was the organization that contacted me to help out in this particular matter. In all due respect, my colleague is incorrect that this is one event for the purposes of standing. This case was filed in 2011. Standing wasn't even raised or brought up until 2016. It's frustrating for you and it's really frustrating for us. Exactly. But unfortunately, you also know the rule. Exactly. I just wanted to mention that for the purposes of this particular case. How's the September 30th letter, what's the injury in fact? It seems like good news. The June 30th letter. Excuse me, June 30th. No, no. The injury in fact, Your Honor, from that particular letter, was simply that Spokio made hundreds and hundreds of cases being litigated throughout the country. And what happened is that Spokio on remand even recognized what Lischy indicated. And that simply is that a concrete injury can be one created by Congress. In this particular case, both letters were letters that were substantive informational rights that were created by Congress. The defendants in this case, the law firm defendants, never provided that particular information that Congress decided to make available to the public. And consumers have a right to receive that information, and the failure to provide that information constitutes a concrete injury because the failure to get that particular information is a violation of the statute. What the law firm defendants are asking this court to do is to ignore that Lischy says that Higgy's half standing, which was cited by Spokio on remand by the Ninth Circuit. And the law firm defendants are asking this court. Spokio dealt with a different statute, right? Yeah, he did. Out of curiosity, are there any cases since Spokio that deal with this statute and this kind of a letter? Yes, there are. Court of appeals? Yes, there are. And we cited one of them, Your Honor, the Moore case. There are three unreported cases and one reported. Moore versus a case which is cited. Are the ones you're telling me all already in the briefs? No, unfortunately, Moore is in the brief. Okay. Then we've got some new ones? Yes, there's three other ones, Your Honor. I'll be more than happy to file a letter with the court on these issues, but one of them is reported. It's called Sayers, S-A-Y-L-E-S, the Advanced Recovery Systems, Inc., 865 Fed Third 246. The other two, Your Honor. Which circuit is that? That's from the Fifth Circuit. I'm sorry, Your Honor. That was the 2017 case. Also, there's another case called Papaitai, excuse my pronunciation, P-A-P-E-T-T-I versus Doe's. That's 691 Fed, A-P-P-X 24. That's a Second Circuit case. And there's another case. It's called D-E-M-A-R-A-I-S versus Gestahl Cargo, P-A. That's an Eighth Circuit case. All these are 2017 cases, Your Honor. Okay. So why don't we do this? So your friend, you haven't told your friend about these cases, right? No. He has not seen these cases. Why don't you by, you know, whatever, Friday, I mean, you obviously have them. Just send us the cases, give him a response if he has any new cases. I mean, this area of the law is moving quickly, so it would be nice to have the fruits of your research. So if you've got something by Monday, send it Monday, and that's great. That'll be fine. We'll read them, and we'll go from there. Thank you. But just tell us what the injury effect, just in a common sense way, what the injury effect is. We're on the same page that Congress can't create, Congress can't just create the injury, because that would be an end run around Article III. So why is this an injury? Well, just, yeah, I'd like to give you that, but I just want to mention one critical thing, and that is the law firm defendant's argument is the epitome of hindsight logic, because they're looking at the outcome to determine whether or not there was an injury. In fact, approximately two years after the settlement of the claim for actual damages against Greentree, law firm defendants attempt to strip the facts to give this court jurisdiction, even though those claims ended up settling. And here's what happened. The Hagees received the summons and complaint. When they received the summons and complaint, they called the law firm defendants. Law firm defendants sent out a deed in lieu of foreclosure, which means we're not going to collect any money from you if you sign off on this, and we'll give you back the property. They do that. And so what happens is, is that after that happens, they get the deed in lieu, and that was the June 30th letter. That's good from their perspective. Right. They then end up getting it, didn't have the civil Miranda warnings, and then in a subsequent communication with Mr. Sandy, the E-11 violation. What about the June 30th letter is hurtful? It's hurtful because it did not provide the 1696G notice. That's just saying the process violation creates an injury in fact, and that's what we're not allowed to do. Right. Yeah, but what happened, Your Honor, was we believe that that's a concrete violation that's directly related to the purpose of the statute, and you could find you have standing for that. But the real risk of harm is they didn't. Wait. Congress regulates something and says you've got to give warnings. Right. The letter is here's $1,000, and it doesn't have the warnings. It doesn't even say return. You don't have to contact us at all. Here is $1,000. That's the letter. Attached is $1,000 in cash, and Congress has said we want a warning with that letter. You can't possibly say that's an injury in fact, even though it's a process violation. Right? Would you agree with me? Or would you say, no, that is an injury in fact? It's an injury in fact, Your Honor. This is an absolute requirement. Here is $1,000. If it's an initial communication, it doesn't mean if it's a gratuitous communication, whether it's a communication. And no other communications. People don't even know each other. But Congress decided that it was going to regulate this particular area, and attorneys are covered by this particular area. So what happened was is that after that, and after they received that letter and didn't get their note, they didn't know what their rights were. So then they started getting telephone calls from Green Tree. These telephone calls, Your Honor, were outrageous in that, and we have the transcript. This particular argument doesn't get Green Tree off the hook. No, and it doesn't get the law firm defendants off the hook either because it's their actions. Do they have any responsibility for the calls from Green Tree? They have the responsibility because if they would have provided the Hagees with notice of their rights under the FDCPA, they could have exercised those rights and in effect had that cease and desist. They went back, as a matter of fact, to Mr. Sandy who wrote a letter to the law firm, and that's contained on page ID number 701 to 702, which clearly indicates that they exercised that right. So therefore, they exercised a right. They had standing to do it. They were never informed of those rights, and they never waived those rights. Law firm defendants tried to get them to forfeit those rights, and those rights are not waivable or forfeitable. The other problem is factually, and I know this isn't that important for the court's analysis, but the Hagees did receive that letter from their counsel. They were required to, as a matter of, as you pointed out, ethics. The law firm defendants sent that letter to the Hagees. It was an important letter because in effect said, hey, you don't have to worry about this. That's why they contacted Mr. Sandy again. Well, although we believe that the plain meaning of the act clearly indicates that indirect communication through a lawyer is certainly something that is subject to the civil Miranda warnings as well as the mini Miranda warnings, Mr. Hagee did get that letter. It's found a document, 67 pages, ID page 599 to 60. So in all due respect to my colleague, he's incorrect. Mr. Hagee did get that letter. And this particular letter, the one, the E11 letter, was a communication within the plain meaning of the act, though it was sent through the attorney. As you indicated, he has an obligation to give that information to his client. I'm sure you know this area way better than I do. You know, you won't like this question, but I still want to hear what the answer is. Let's just say you're wrong about this particular letter, June 30th, okay? Let's just say I look at it and I say to myself, I can't understand any way in which the word injury could have meaning and this would count as an injury, okay? So just hypothetically, that's my view of it. How would that mess up the statute in the way this works? Because, I mean, there are plenty of these. and not just say, show they really do create an injury, including emotional injuries primarily. So that's usually a pretty easy thing to show. So I'm trying to figure out whether this puts some big hole in the statute or if it's really a pretty modest problem that in most disputes, it'll be pretty easy to find a communication that satisfies the injury in fact requirement. Right. Well, Congress, the reason why it's necessary and mandatory is because Congress wanted to make sure that this law was uniformly applied. And Congress wanted to make sure that they would eliminate debt collection problems like we had in this particular case. Giving people their rights gives them an opportunity to exercise those rights. And that's what Congress wanted to do. It wanted to make sure that consumers were protected, that debt collectors treated people in a civil manner, which includes giving them the opportunity to know what their rights are. And the failure to provide those rights is a mistake. For example, if you called up a debt collector's telephone, on the answer machine, they're going to tell you, this is a debt collector. Any information you give out is going to be used for this purpose. Everybody does this. This particular defendant didn't do it. As a matter of fact, at their deposition, five different times, Mr. DeMars indicated, and this is on page ID numbers 654, 655, and 662, indicated he emphatically denied he was a debt collector, and the court had to rule that he was a debt collector under this court's ruling in Glaser. But he emphatically denied it. So that's why he didn't put the information on. If he thought he was a debt collector, he would have put the information on. That's my point. He didn't think he was. The regulatory regime created by my hypothetical. I mean, you're not going to take cases where the only communications are, here's $1,000 or you don't have to pay, we're sorry we bothered you, case over. I mean, you're not going to take those cases. You're not going to encourage people to litigate those cases. You're going to say they just gave you everything you wanted. Why would you sue about the fact that it didn't have a Minnie Miranda warning? Your Honor, I agree with you 100%. It's a practical matter. I would never do that because as a public interest law firm, nobody should take them. What you should do under those circumstances is what I tried to do at the beginning of this case, and that's to write the other attorney. I wrote him two different times. I sent him a copy of the complaint. I tried to get this whole case resolved. It couldn't get resolved. It was litigated. But the case you're talking about happens to be something that Judge Sir Heinrich came up or brought up during the Frye decision. He brought that up, and he brought that up because there was a law firm that was filing all these cases just to make money. But that particular case is factually distinguishable from this particular case because in that case, that was a post-judgment information, and they had been dealing with each other for years. The attorney even gave comparable wording in the letter, and there's no wording in our letter in this particular case. The attorney in that case admitted it was a debt collector. The attorney in this case denied it and fought it out. In that particular case, the debt had not been paid. And in our case, the debt had been paid, and they were trying to collect on it. This case was brought with actual damages. In that case, it was not brought with any actual damages. It was just a gotcha type of letter. I wouldn't practically take it. Judge Sir Heinrich brought that up. He says, you know, maybe this isn't the kind of stuff you should be doing in federal court. You know, I would look at it more closely if I was a district court judge. And the other thing is, is that, you know, I'm thinking about letters. I hate to introduce evidence from my own experience, but, you know, we overpay our bills all the time. We're utterly irresponsible. And then we get these letters that say, you know, I'm sorry. You know, here's $50 back. You didn't need to pay that copay or whatever. They never come with warnings, and I would just find it absolutely bizarre that they should. The reason why they don't. We have a debt relationship. The reason why those don't is because those aren't coming from debt collectors. Debt collectors are people that collect for third parties. You're getting the check back, for example, from. The statute doesn't apply when you ask someone to pay a bill? It only applies when a third party asks, like an attorney or a debt collection agency, asks to pay back a bill. All right. Spared me that anxiety. Oh, yeah, definitely. Yeah, it does. It means I don't have an injury in federal court. Creditors are allowed to collect their own bills without any applicability of the FDCPA. And there's a whole load of cases that deal with that. I just want to briefly. It lights on. If you want to just give us one sentence with not too many depending clauses, that would be great. The CSPA applies, Your Honor, because Green Tree was a supplier. It zealously fought out that it was an assignee. The court in docket 65 found that the. No, excuse me. The court in docket 44 found that it was a supplier engaged in a consumer transaction because there was an assignment from Kinsenko. And so, therefore, this other argument regarding that they are some sort of exempt from liability really doesn't apply because anything that happened after that doesn't matter. Thank you very much. Thank you very much. Mr. Bennett, do you have some rebuttal here? Yes, Your Honor. To clear up the record, the Hagees never cited any injury from anything the law firm defendants did in this case. There's nowhere in the record where they said because law firm defendants did this or omitted this, we suffered anything. What happened was, and I think it's all in the record, is Green Tree started contacting the Hagees after the fact when they shouldn't have. The law firm defendants assisted in clearing that up by telling Green Tree, hey, stop it. In fact, law firm defendants had to disclose privileged communications with Green Tree to clear that up and show the court, listen, it was not law firm defendants that did this. Green Tree did this on their own. Law firm defendants helped to clear up the problem. Second of all, concreteness. Concrete is a metaphor. A question of what was your concrete injury should have a concrete answer. What is your concrete injury? Once you veer into, well, the purpose is this, you've lost concreteness, it's gone. But I assume they can file an affidavit and say it made them anxious. Maybe even just anxious because they didn't know what it meant. They were deposed on the matter. And he was asked, was there any confusion? No, this is just the way it had to be. That's what Mr. Hagee said. And, of course, the attorney said he found it slightly presumptuous that he would need the mini Miranda on the cover letter to him. So neither of them alleged any injury from the missing mini Miranda to either of their letters. And, again, there is no... Were they given a chance to identify injury after Spokio? Were they given to? I'm just making the point. Spokio is what kind of introduced this. Well, they were given a chance to show a concrete injury. Not afterwards, not after Spokio. But I don't think we would want them to adjust their testimony after a case comes out so they can meet the requirements of Article 3. The OCSPA issue is one that Anderson v. Barclays addressed. Clearly, mortgage servicers are not suppliers and the servicing of a mortgage is not a consumer transaction. The fact that there may have been personal property on this premises at some point is irrelevant because the foreclosure related only to real property. Whether it started out as a mobile home or whether the plaintiffs moved an RV onto this parcel at some point during their ownership, it makes no difference because it was one foreclosure requesting foreclosure of real property and attachments, and that's it. Thanks for your time. Thank you for your briefs. We appreciate it. Thank you for your helpful arguments.